UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Case No. 10 Civ. 6528 (DLC) |
| Boston Generating, LLC, et al.,[1] | Bankruptcy Case No. 10-14419 (SCC) |
| Debtors. | Chapter 11 |

**OPPOSITION TO MOTION OF ALGONQUIN GAS TRANSMISSION, LLC
FOR WITHDRAWAL OF REFERENCE WITH RESPECT TO FIRST OMNIBUS
MOTION OF DEBTORS FOR ENTRY OF ORDER AUTHORIZING THE DEBTORS
TO REJECT CERTAIN EXECUTORY CONTRACTS *NUNC PRO TUNC* TO THEIR
RESPECTIVE NOTICE DATES**

D. J. Baker
Robert J. Rosenberg
James E. Brandt
Adrienne K. Eason Wheatley
Caroline A. Reckler (appearing *pro hac vice*)
Kimberly A. Posin (appearing *pro hac vice*)
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022-4834
Telephone:  (212) 906-1200
Facsimile:  (212) 751-4864

*Proposed Counsel to the Debtors and Debtors-in-Possession*

September 17, 2010

---

[1] The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Boston Generating, LLC (0631); EBG Holdings LLC (3635); Fore River Development, LLC (7933); Mystic I, LLC (0640); Mystic Development, LLC (7940); BG New England Power Services, Inc. (0476); and BG Boston Services, LLC (6921).

# TABLE OF CONTENTS

Page

Preliminary Statement……………………………………………………………………1

STANDARD OF REVIEW ...............................................................................................1

STATEMENT OF FACTS .................................................................................................4

      A.      The BostonGen Companies' Business Operations ...................................................5
      B.      The Algonquin Service Agreement ........................................................................5
      C.      The Chapter 11 Cases ............................................................................................7
      D.      The Service Agreement Has No Meaningful Value to Fore River .........................7

PROCEDURAL HISTORY................................................................................................10

ARGUMENT .....................................................................................................................10

      A.      Rejection of an Executory Contract is a "Core Proceeding" That Should
                 Remain in the Bankruptcy Court .........................................................................11
      B.      As a Routine Breach of Contract Matter, Reference to the Bankruptcy
                 Court Should Not Be Withdrawn..........................................................................11
             1.      Section 365(g) of the Bankruptcy Code defines rejection of an
                       executory contract as a breach of contract claim .......................................12
             2.      Rejection of the Service Agreement does not constitute a
                       modification in rates subject to FERC's exclusive jurisdiction or
                       the filed rate doctrine ................................................................................12

CONCLUSION....................................................................................................................17

TABLE OF AUTHORITIES

**CASES**

*Ark. La. Gas Co. v. Hall*,
  7 FERC ¶ 61,175 (1979) ........................................................................................... 14

*Baker v. Simpson*,
  2010 U.S. App. LEXIS 15748 (2d Cir. July 30, 2010) ........................................... 10

*Cal. Dept. of Water Res.*,
  121 FERC ¶ 61,191 (2007) *reh'g denied*, 124 FERC ¶ 61,216 (2008) ................... 15

*Cal. Elec. Oversight Board v. Calpine Energy Servs., L.P.*,
  114 FERC ¶ 61,003 (2006) ....................................................................................... 16

*Celotex Corp v. Edwards*,
  514 U.S. 300 (1995) .................................................................................................. 11

*City of New York v. Exxon Corp.*,
  932 F.2d 1020 (2d Cir. 1991) .................................................................................... 1

*Columbia Gas Transmission Corp.*,
  71 FERC ¶ 61,194 (1995) ......................................................................................... 16

*COR Route 5 Co., LLC v. Penn Traffic Co.* (In re Penn Traffic Co.),
  524 F.3d 373 (2d Cir. 2008) ...................................................................................... 12

*Idaho Power Co.*,
  39 FERC ¶ 61,032 (1987) ......................................................................................... 14

*In re Adelphi Institute, Inc.*,
  112 B.R. 534 (S.D.N.Y. 1990) .................................................................................. 1

*In re Calpine Corp.*,
  337 B.R. 27 (S.D.N.Y. 2006) ........................................................................ 12, 13, 14

*In re Chadborne* Indus., Ltd.,
  100 B.R. 662 (S.D.N.Y. 1989) .................................................................................. 1

*In re Child World, Inc.*,
  147 B.R. 847 (Bankr. S.D.N.Y. 1992) ...................................................................... 12

*In re Columbia Gas Sys.*,
  Case No. 91-803, 1991 U.S. Dist. LEXIS 17561 (D. Del. 1991) ............................. 15

*In re Enron Corp.*,
  2005 WL 1185804 (S.D.N.Y. 2005) ......................................................................... 2

NY\1686363.2

*In re Enron Corp.*,
    388 B.R. 131 (Bankr. S.D.N.Y. 2008). ..................................................... 2, 3

*In re Enron Power Marketing, Inc.*
    2003 WL 68036 (S.D.N.Y. Jan. 8, 2003) ............................................... 1, 2

*In re Lavigne*,
    114 F.3d 379 (2d Cir. 1997) ............................................................... 11

*In re Mirant Corp.*,
    378 F.3d 511 (5th Cir. 2004) ............................................................. 13, 14

*In re Texaco, Inc.*,
    77 B.R. 433 (Bankr. S.D.N.Y. 1987) ................................................... 11

*In re Texaco, Inc.*,
    84 B.R. 911 (S.D.N.Y. 1988) .............................................................. 2, 3

*In re Turbowind, Inc.*,
    42 B.R. 579 (S.D. Cal. 1984) ............................................................. 11

*In re VWE Group, Inc.*,
    359 B.R. 441 (S.D.N.Y. 2007) ........................................................... 10

*Kentucky Utils. Co.*,
    110 FERC ¶ 61,285 (2004) ............................................................... 15

*Kern River Gas Transmission Co.*,
    101 FERC ¶ 61,374 (2002) ............................................................... 16

*Portland General Elec. Co.*,
    72 FERC ¶ 61,009 (1995) ................................................................. 15

*Shugrue v. Air Line Pilots Ass'n Int'l (In re Ionosphere Clubs, Inc.)*,
    922 F.2d 984 (2d Cir. 1990) ............................................................. 1, 12

*Southern Co. Servs., Inc.*,
    37 FERC ¶ 61,256 (1986) ................................................................. 14, 16

*Water & Power Dept. of the City of Glendale v. Portland General Elec. Co.*, 113 FERC ¶ 61,285
    at P 16 (2005), *reh'g denied*, 115 FERC ¶ 61,231 (2006) ........................... 15

*Williston Basin Interstate Pipeline Co. v. KN Energy, Inc.*,
    58 FERC ¶ 61,001 (1992) *reh'g denied*, 59 FERC P 61,011 (1992), *remanded sub nom.*, *KN
    Energy, Inc. v. FERC*, 1993 WL 205869 (D.C. Cir. 1993), *vacated in part on other grounds*,
    63 FERC ¶ 61,260 (1993) ................................................................. 16

iii

**STATUTES**

11 U.S.C. § 157(d) ............................................................................................... 1

11 U.S.C. § 365(g) .......................................................................................... 11, 12

11 U.S.C. § 365(g)(1) ........................................................................................ 12

11 U.S.C. § 502(g) .............................................................................................. 13

28 U.S.C. 157(b)(2)(A) ...................................................................................... 11

**OTHER AUTHORITIES**

3-365 COLLIER ON BANKRUPTCY ........................................................................ 12

NY\1686363.2

This dispute involves an executory contract that certain debtors and debtors in possession seek to reject.  Faced with a potential loss of over $700,000 in monthly fees, contractual counterparty Algonquin Gas Transmission, LLC ("Algonquin"), has moved to withdraw the reference from bankruptcy court on the ground that rejection of a natural gas transportation contract necessarily involves substantial and material consideration of federal energy law. Algonquin is wrong.  As explained more fully below, rejection of the Algonquin contract has nothing to do with federal energy law.  Rejection of Algonquin's executory contract does not involve changing rates reflected in the contract, nor does it involve matters reserved for consideration by federal regulatory authorities.  Indeed, it does not involve federal laws outside of Title 11 at all.  As a routine bankruptcy motion that arises exclusively under state law, and for which damages pursuant to breach of contract are Algonquin's only remedy, there is simply no basis for concluding that the debtors' motion belongs anywhere other than bankruptcy court.  For the foregoing reasons, and those articulated below, the debtors and debtors in possession in this matter respectfully request that Algonquin's motion be denied in all respects.

## STANDARD OF REVIEW

Bankruptcy proceedings are automatically referred to the United States Bankruptcy Court for the Southern District of New York pursuant to the "Standing Order of Referral of Cases to Bankruptcy Judges," dated July 10, 1984.

Withdrawal of the reference occurs only where a "***substantial and material*** consideration of non-Bankruptcy Code federal [law] is necessary [to] resolution of the proceeding." *Shugrue v. Air Line Pilots Ass'n Int'l (In re Ionosphere Clubs, Inc.)*, 922 F.2d 984, 995 (2d Cir. 1990) (emphasis added).  "Substantial and material" consideration of non-bankruptcy federal law has been construed to mean that (i) the federal issue is one of first impression, (ii) the meaning of the

1

non-bankruptcy federal statute is unclear, or (iii) the proceeding involves a substantial and material conflict between the Bankruptcy Code and non-bankruptcy federal law. *See e.g., In re Enron Power Marketing, Inc.* 2003 WL 68036, * 4 (S.D.N.Y. Jan. 8, 2003); *see also In re Adelphi Institute, Inc.,* 112 B.R. 534 (S.D.N.Y. 1990) (motion for withdrawal denied even though resolution of the issue may require consideration of RICO claim).

Holding otherwise, by concluding that "a withdrawal is mandatory whenever a non-Code provision is considered[,] would frustrate the ability of the bankruptcy courts to resolve debtor-creditor issues, because it would require withdrawal of any issue involving even *de minimis* consideration of a statute other than the Code." *In re Chadborne* Indus., Ltd., 100 B.R. 662, 667 (S.D.N.Y. 1989).  That is why Algonquin concedes, as it must, that "routine application" of non-bankruptcy law is insufficient to withdraw the reference.  (Algonquin Br. at 12 (*quoting City of New York v. Exxon Corp.,* 932 F.2d 1020, 1026 (2d Cir. 1991) for the proposition that the mandatory withdrawal provision of 11 U.S.C. § 157(d) "require[s] withdrawal . . . of cases or issues that would otherwise require a bankruptcy court judge to engage in ***significant interpretation, as opposed to simple application***, of federal laws apart from the bankruptcy statutes" (emphasis added)).)  The bankruptcy court must be called upon to "to engage itself in the ***intricacies*** of non-bankruptcy law" before withdrawal of the reference is appropriate.  *In re Enron Corp.*, 388 B.R. 131, 136 (Bankr. S.D.N.Y. 2008).

No substantial and material consideration of non-bankruptcy federal law is implicated here.  That is because Algonquin's arguments and allegations amount to nothing more than a breach of contract claim resulting from routine rejection of an executory contract.  Such facts are insufficient on their face to support withdrawal of the reference.  *In re Enron Power Marketing, Inc.*, 2003 WL 68036, at *5 (mandatory withdrawal not warranted for "a simple action for ...

breach of contract," which "[t]he Bankruptcy Court can resolve ... by analyzing and considering the clear and unambiguous language of the [agreement] itself and the facts in this case").

There is no actual conflict, potential conflict, or even any "arguable" conflict between non-bankruptcy federal laws and Title 11 that is created by the Debtors' decision to reject Algonquin's contract. Nothing more or less than an action for breach of contract is at issue here, and no amount of citation to federal energy law can change that. *See, e.g., In re Enron Corp.*, 2005 WL 1185804 (S.D.N.Y. 2005) ("bare contention" that Federal Energy Regulatory Commission decisions presented "conflicting" area of law failed to persuade the court that substantial and material interpretations of federal law were implicated).

Even if a conflict between non-bankruptcy federal law and Title 11 was theoretically possible in this case (and it is not), such result would be insufficient to sustain a motion to withdraw the reference on the ground that involvement of any non-bankruptcy federal law is not yet ripe. In *In re Texaco, Inc.,* 84 B.R. 911 (S.D.N.Y. 1988), for example, the court denied a motion to withdraw the reference as to motions to assume oil and gas leases because the only issue under consideration was whether the leases were assumable. Legal questions concerning the Natural Gas Policy Act were not yet ripe.

> In addition to the substantial and material consideration standard, a court should take into consideration whether the withdrawal motion is based upon speculation about federal issues which may or may not arise and may or may not be germane to resolution of core Code proceedings.

84 B.R. at 921.

The *Texaco* court refused to withdraw the reference based upon the speculative involvement of non-bankruptcy issues of law because doing so would be "inconsistent with the purposes underlying the Bankruptcy Code and would encourage forum shopping in a manner Congress disdained when it sought to avoid creating a multiplicity of forums for the adjudication

3

of part of a bankruptcy case."  *Id.  See also In re Enron Corp.,* 388 B.R. at 142 (denying motion

to withdraw the reference where it was "premised upon an issue [of non-bankruptcy federal law]

that the bankruptcy court may never be required to consider").[2]

## STATEMENT OF FACTS

The Debtors in this matter are EBG Holdings LLC ("EBG") and its direct and indirect

subsidiary companies, including Boston Generating, LLC ("BostonGen"), which, in turn, is the

parent company of three operating companies that own and operate electric power generating

facilities located in the Boston metropolitan area; namely, Fore River Development, LLC ("Fore

River"), Mystic I, LLC ("Mystic I") and Mystic Development, LLC ("Mystic Development," and

together with BostonGen, Fore River, and Mystic I, the "BostonGen Companies").  (Declaration

of Jeff Hunter in Support of Opposition to Motion to Withdraw the Reference,  ¶ 10.)

The BostonGen Companies are merchant power plants, which generate revenue primarily

by selling electrical energy and associated products, such as electrical capacity, into regional

wholesale markets administered by ISO New England Inc. ("ISO-NE") and regulated by the

Federal Energy Regulatory Commission ("FERC").  (Id. at ¶ 12.)   The merchant generation

capacity of the BostonGen Companies constitutes one of the largest merchant generation fleets in

New England (id. at ¶ 13), and helps to maintain a reliable electricity supply for the city of

---

[2]     The appropriate standard of review for authorizing the rejection of natural gas
transportation service agreements – and whether that standard should be the business
judgment rule or a public interest test  (Algonquin Br. at 3, 14, 20-22) – is premature on a
motion to withdraw the reference, where the only issue to be determined is which court
has jurisdiction.  Algonquin's discussion of whether the business judgment or public
interest standards should apply thus conflates and confuses the issues to be decided on
this motion.  As Algonquin itself concedes, "the ability of Fore River to reject the
HubLine Service Agreement and the appropriate standard to be applied ***are issues for
another day***."  (Algonquin Br. at 19 (emphasis added).)  The Debtors will address those
issues at such time that the merits of their decision to reject the Algonquin contract are
ripe for review.

Boston and its surrounding communities (Id. at ¶ 10).

### A.     The BostonGen Companies' Business Operations

The BostonGen Companies own and operate three power generating facilities: (1) Mystic Station, (2) Mystic 8&9, and (3) Fore River.  (Id. at ¶ 14.)  The executory contract at issue here relates to Fore River, which owns a power generation facility located on a 77-acre site in North Weymouth, Massachusetts, approximately 12 miles south of Boston (the "Fore River Facility"). (Id. at ¶ 17.)  The Fore River Facility commenced operations in August 2003, and generates electricity using fuel transported over the Algonquin Hubline pipeline (the "Pipeline").  (Id.) Several suppliers transport fuel on the Pipeline, thus providing Fore River with numerous options for satisfying its fuel supply and transportation requirements.  (Id.)  Fuel management services have variously been provided by Sempra Energy Trading LLC ("Sempra") and Sequent Energy Management, L.P. ("Sequent").  (Id.)

### B.     The Algonquin Service Agreement

On or about January 31, 2001, Sithe Fore River Development LLC (later renamed Fore River), Algonquin Gas Transmission, LLC ("Algonquin") and Sithe Power Marketing, L.P. entered into that certain Service Agreement (Applicable to Rate Schedule AFT-1) (the "Service Agreement").

The Service Agreement is a transportation agreement pursuant to which Fore River pays a fixed fee of $718,000 per month to Algonquin in exchange for the right to use capacity on the Pipeline to transport up to 140,000 dekatherms ("Dth") of natural gas per day on a firm basis to the Fore River Facility.  (Id. at ¶ 19.)  Fore River pays Algonquin the monthly fixed fee simply to reserve this capacity regardless of whether any of the capacity is actually utilized. (Id.)  Fore River pays an additional variable fee based upon how much of the reserved capacity is actually utilized at any given time.  (Id. at ¶ 20.)  The negotiated rates provided for in the Service

Agreement were approved by FERC in February 2008.  (<u>Id</u>.)

Algonquin only provides Fore River with a right to priority use of transportation capacity on its Pipeline from a specified receipt point to a specified delivery point (at "Fore River"); it does not supply Fore River with any natural gas under the Service Agreement.  (<u>Id</u>. at ¶ 21.)

Pursuant to the Service Agreement, gas can be transported to the Fore River Facility from two "Primary Receipt Points."  (<u>Id</u>. at ¶ 22.)  One contract's primary receipt point is where the Pipeline connects to what are known as the Q and I-3 systems ("<u>Q/I-3</u>").  (<u>Id</u>.)  The other contract's primary receipt point is in Beverly, Massachusetts ("<u>Beverly</u>"), where the Pipeline connects to the Maritime & Northeast pipeline (which delivers gas from the Maritime provinces in Canada, including New Brunswick, Nova Scotia, and Newfoundland).  (<u>Id</u>.)  The total amount of reserved transportation capacity available to Fore River under the Service Agreement is split equally between the Q/I-3 and Beverly receipt points (i.e., up to 70,000 Dth from each).  (<u>Id</u>.)

Given FERC's open access rules for natural gas pipelines, transportation capacity on the Pipeline is available to competing, non-affiliated companies, referred to as "shippers," on a non-discriminatory basis.  (<u>Id</u>. at ¶ 23.)  Under FERC's open access rules, these shippers, in turn, are free to resell this capacity to other shippers.  (<u>Id</u>.)  In other words, as a result of the open access rules, there are numerous, competing shippers from whom Fore River can purchase fuel on the Pipeline to ensure the available supply of natural gas to the Fore River Facility.  (<u>Id</u>. at ¶ 24.) Fore River's suppliers can use the transportation capacity available from the Service Agreement, or they can use transportation capacity available from other shippers.  (<u>Id</u>.)  For example, Sequent, from which Fore River purchases all of the gas it requires to generate electricity at the Fore River Facility, prices its services to include the costs for transportation over the Pipeline in addition to gas supply costs.  (<u>Id</u>.)

6

C.     **The Chapter 11 Cases**

Despite their strategically positioned and highly efficient facilities and other competitive advantages, the BostonGen Companies are over-levered and, due to market conditions, are unable to generate sufficient cash to service their debt and fund ongoing operations.  (Id. at ¶ 42.)

As a result, on August 18, 2010, each of the BostonGen Companies filed for bankruptcy in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").  (Id. at ¶ 44.)

As part of the bankruptcy process, the BostonGen Companies have reviewed each of their existing contracts and, in the exercise of their business judgment, determined which contracts should continue as necessary components of the Debtors' business, and which contracts should be rejected on the ground that they provide no continuing benefit to the BostonGen Companies or their estates. (Id. at ¶ 45.)

To that end, on August 27, 2010, the Debtors filed their *First Omnibus Motion of Debtors for Entry of Order Authorizing the Debtors to Reject Certain Executory Contracts Nunc Pro Tunc to Their Respective Notice Dates* (the "Motion to Reject") in the Bankruptcy Court seeking to reject certain contracts, including the Service Agreement because Fore River neither needs nor wants the transportation capacity it pays to reserve under the Service Agreement, especially given the significant burden the cost of this reserved capacity poses on the Fore River estate.  (Id. at ¶ 46.)

D.     **The Service Agreement Has No Meaningful Value to Fore River**

US PowerGen has always known that the Service Agreement had little if any value.  (Id. at ¶ 25.)  The Service Agreement was entered into not because firm transportation options were needed specifically from Algonquin, but because such contracts were essentially a condition precedent to financing when the Fore River Facility was constructed.  (Id. at ¶ 30.)

For several reasons, Fore River never needs to rely on the transportation capacity available to it under the Service Agreement, and prefers not to use it in any event.  (Id. at ¶ 35.)

First, only a small, unreliable amount of gas is available at both of the receipt points identified in the Service Agreement.  (Id. at ¶ 26.)  Fore River has never been able to obtain gas at the Q/I-3 receipt point.  (Id. at ¶ 27.)  As a result, a *full* half of the transportation capacity reserved under the Service Agreement (i.e., 70,000 Dth) is not useable.  (Id.)

The Beverly receipt point is typically unreliable and inconsistent as a source of gas supply for the Fore River Facility because it draws fuel from Canada, whose primary natural gas reserves have depleted much faster than originally anticipated.  (Id. at ¶ 28.)  As a result, gas available for purchase at that receipt point has not been frequently available in sufficient quantity.  (Id.)  Additionally, Beverly, as a gas supply source, is typically uneconomic, resulting in severe underutilization of the only potentially operative receipt point identified in the Service Agreement.  (Id.)  Far more reliable sources of gas are available through natural gas marketers who sell gas to Fore River delivered at the plant, most of which draw their supplies from the Gulf Coast region and then transport that gas to the Northeast market on pipelines which feed into the Algonquin Pipeline.  (Id. at ¶ 29.)

Second, Fore River has historically been able to procure gas and have it delivered to the Fore River Facility at a delivered cost lower than utilizing the Service Agreement.   (Id. at ¶ 37.)  Indeed, Fore River has never had a problem procuring necessary fuel for the Fore River Facility.  (Id.)  Given FERC's rules guaranteeing non-discriminatory access to the Pipeline, there is more than sufficient gas available for delivery to the Fore River Facility, both during peak electrical demand season and otherwise, without regard to the Service Agreement.  (Id.)

For example, over 76% of the gas Fore River purchased between January 1, 2008 and

August 31, 2010, did not involve the utilization of the transportation capacity available under the Service Agreement.  (Id. at ¶ 37.)  And Fore River can readily procure 100% of its daily gas requirements without using the capacity reserved under the Service Agreement.  (Id.)  As just one example, the daily volume of fixed price gas for next day delivery at the Pipeline and reported by The IntercontinentalExchange averaged 185,000 Dth per day for the period of September 1, 2009 through August 31, 2010 – over three times the approximately 55,000 Dth per day that are delivered to the Fore River Facility.  (Id.)

Third, there are certain technical aspects of the Service Agreement that are not needed by Fore River.  (Id. at ¶ 39.)  For example, the pressure assurance provisions in the Service Agreement, which protect against drops in gas pressure, have been mooted by Fore River's installation of natural gas compressors.  (Id.)  These compressors allow the Fore River Facility to operate when the pressure on the Pipeline drops below the required pressure and prevent the BostonGen Companies from having to rely on pressure assurances provided for in the Service Agreement.  (Id.)

Failing to use the Service Agreement has had no impact at all on the ability of the Fore River Facility to operate reliably.  (Id. at ¶ 39.)  Prior occasions where Fore River has utilized transportation capacity under the Service Agreement has never been the result of reliability concerns.  (Id.)  Indeed, Fore River has never been forced to use the Service Agreement because firm transportation capacity was not otherwise available or because Fore River needed natural gas to be delivered on the "priority" basis set out in the agreement.  (Id.)

The Service Agreement does not add unique value or provide increased reliability to the Fore River Facility given that Fore River's delivered fuel requirements can easily be met through reliance on other shippers and suppliers, and further given the fact that the receipt points in the

Service Agreement do not provide any source of gas supply (in the case of the Q/I-3 receipt point) or an unreliable and inconsistent source of gas supply (in the case of the Beverly receipt point, where there has never been adequate economic supply available to even partially supply the Fore River Facility).  (Id. at ¶ 33.)

## PROCEDURAL HISTORY

The BostonGen Companies filed for bankruptcy on August 18, 2010, in the Bankruptcy Court and are operating their businesses as debtors and debtors-in-possession.  The Motion to Reject was filed on August 27, 2010, in the Bankruptcy Court and was set for hearing on September 13, 2010.

In response, Algonquin filed its *Motion of Algonquin Gas Transmission, LLC For Withdrawal of Reference With Respect to First Omnibus Motion of Debtors For Entry of Order Authorizing the Debtors to Reject Certain Executory Contracts Nunc Pro Tunc to Their Respective Notice Dates* [Docket No. 1] (the "Motion to Withdraw") on September 1, 2010, in the Bankruptcy Court and on September 2, 2010, in this Court.

On or about September 3, 2010, the BostonGen Companies and Algonquin entered into a Stipulation agreeing to postpone the hearing on the Motion to Reject until the first omnibus hearing after the Motion to Withdraw is denied or withdrawn.

## ARGUMENT

As the facts make clear, the Debtors' decision to reject the Algonquin contract has nothing at all to do with non-bankruptcy federal law.  It has nothing to do with rate-setting, nothing to do with federal energy law, and everything to do with matters that rest squarely and exclusively within the core jurisdiction of the Bankruptcy Court; namely, an executory contract for excess capacity that is unwanted, unreliable, and that relates to undesirable capacity.

The rejection of the Service Agreement is a core bankruptcy proceeding that gives rise to a claim for breach of contract.  As the governing statutes and cases make clear, disposition of Algonquin's routine breach of contract claim should be, and is, squarely within the jurisdiction of the Bankruptcy Court, where it should remain.

A.      **Rejection of an Executory Contract is a "Core Proceeding" That Should Remain in the Bankruptcy Court.**

"Core proceedings" are those that "invoke a substantive right created by federal bankruptcy law that would not exist outside of a bankruptcy case." *In re VWE Group, Inc.,* 359 B.R. 441, 448 (S.D.N.Y. 2007).  *See also Baker v. Simpson*, 2010 U.S. App. LEXIS 15748 *11 (2d Cir. July 30, 2010) (core proceedings have "no existence outside of bankruptcy").

Because they are "matters concerning the administration of the estate," motions to reject executory contracts, such as the one at issue here, "are core proceedings in which the Bankruptcy Court may make a final determination."  *In re Turbowind, Inc.,* 42 B.R. 579, *583 (S.D. Cal. 1984).  Within the Second Circuit, "[t]here is no question that proceedings to assume or reject executory contracts or unexpired leases are matters concerning the administration of the estate within the meaning of 28 U.S.C. 157(b)(2)(A) and are core proceedings." *In re Texaco, Inc.,* 77 B.R. 433 (Bankr. S.D.N.Y. 1987) (collecting cases).

As such, the Debtors' motion to reject the Service Agreement properly rests with the Bankruptcy Court. *See Celotex Corp v. Edwards*, 514 U.S. 300, 308 (1995) ("Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so they might deal efficiently and expeditiously with the bankruptcy estate."). *See also In re Texaco, Inc.,* 77 B.R. at 437.

B.      **As a Routine Breach of Contract Matter, Reference to the Bankruptcy Court Should Not Be Withdrawn.**

The Bankruptcy Court's jurisdiction is underscored by the fact that rejection of executory contracts results in routine claims for breach of contract, which can and should be resolved by

the Bankruptcy Court.

      **1.**    <u>Section 365(g) of the Bankruptcy Code defines rejection of an executory</u>
<u>contract as a breach of contract claim</u>

      Pursuant to Section 365 of the Bankruptcy Code, debtors are permitted to "go through the inventory of executory contracts . . . and decide which ones it would be beneficial to adhere to and which ones it would be beneficial to reject." *In re Lavigne*, 114 F.3d 379, 386 (2d Cir. 1997). Decisions to reject executory contracts, like Algonquin's, result in a claim for breach of contract. The non-rejecting counterparty is entitled to an unsecured claim for damages arising from the breach. 11 U.S.C. § 365(g) (with exceptions not applicable here, "the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease . . .if such contract or lease has not been assumed . . .").

      Courts have interpreted Section 365(g) consistently with its plain language: rejection of a contract in bankruptcy is tantamount to a breach. *See COR Route 5 Co., LLC v. Penn Traffic Co.* (In re Penn Traffic Co.), 524 F.3d 373, 378 (2d Cir. 2008) ("Rejection is in effect a decision to breach the contract or lease. . . . In the event of rejection, the non-debtor party is generally relegated to pursuing an unsecured prepetition claim against the estate"); *id.* ("Where assets of the estate are insufficient to pay unsecured creditors in full, the non-debtor party to a rejected executory contract**,** like other unsecured creditors of the estate, may receive only a fraction of the value of its claim"); *In re Child World, Inc.*, 147 B.R. 847, 852 (Bankr. S.D.N.Y. 1992) ("[R]ejection under 11 U.S.C. § 365(a) simply means that the court will permit the debtor to breach the contract, with the result that the contractual obligations will be reduced to general unsecured claims for prepetition damages pursuant to 11 U.S.C. § 365(g)(1)"); *In re Calpine Corp.,* 337 B.R. 27, 34 (S.D.N.Y. 2006) (rejection of a contract "amounts to an intentional breach of the contract, transforming the contractual obligations into a claim for damages treated

12

as all other unsecured claims for damages against the estate").

Leading treatises on bankruptcy law similarly conclude that rejection of an executory contract, like the Service Agreement, is tantamount to breach. *See, e.g.,* 3-365 COLLIER ON BANKRUPTCY P 365.10 ("Section 365(g) provides that rejection of a contract or lease that has not previously been assumed in the case constitutes a breach immediately before the date of the filing of the petition.").

As a routine breach of contract claim, substantial and material consideration of non-Bankruptcy Code federal law is ***not*** necessary to resolution of this proceeding. *In re Ionosphere Clubs, Inc.*, 922 F.2d at 995.

> **2.** Rejection of the Service Agreement does not constitute a modification in rates subject to FERC's exclusive jurisdiction or the filed rate doctrine

As a breach of contract claim, rejection of the Service Agreement in no way constitutes a modification of the rate, terms or conditions of that agreement. Rather, the existing rates, terms, and conditions are relevant only as a means of measuring damages. 11 U.S.C. § 502(g). The filed rate doctrine is not implicated here.

As the Fifth Circuit explained in *In re Mirant Corp.*, 378 F.3d 511 (5th Cir. 2004), when rejection is properly understood as the breach (rather than modification) of a contract, it is clear that there is no tension between rejection under Section 365 and non-bankruptcy sources of federal law, including the Natural Gas Act ("NGA"), the Federal Power Act ("FPA"), or the filed rate doctrine.

In *Mirant*, the counterparty to a contract claimed, as Algonquin does here, that the FPA and the filed rate doctrine barred Mirant's rejection of the contract. The Fifth Circuit rejected such arguments, holding that neither the FPA nor the filed rate doctrine were implicated. *See, e.g., id.* at 519-520 (rejection of a contract has only an "indirect effect" on the filed rate). Filed

13

rates are relevant only as a means of calculating damages, not as a means of determining jurisdiction. *Id.* at 522 ("A motion to reject an executory power contract is not a collateral attack upon that contract's filed rate because that rate is given full effect when determining the breach of contract damages resulting from the rejection.").

The court's decision in *In re Calpine Corp.*, 337 B.R. 27 (S.D.N.Y 2006), does not change that result. After acknowledging that its holding is "in obvious conflict" with *Mirant*, the *Calpine* court itself provided the basis for distinguishing that case from this one; namely, a class of debtors who sought termination of the contract at issue because they were forced to sell energy at below market rates. *Id.* at 37-38. No other rationale for rejecting the contract was offered. *Id.* The facts here, and in *Mirant*, are clearly distinguishable in that they involve contracts presenting "excess capacity issue[s]" that were not present in *Calpine*.[3] Where a debtor seeks a lower rate, as in *Calpine*, rejection does not merely "'indirectly affect' the filed rate; it is a collateral attack on it." *Id.* at 38.

Here, however (and in *Mirant*), the contract at issue is surplus. It is duplicative of other contracts available to the Debtors, it is unwanted for various quality-related reasons, and it is unnecessary given the alternative fuel transportation sources that are readily available. Indeed, fully half the capacity under the Service Agreement, *i.e.*, the I-3/Q-1 Interconnection receipt point, has not been used to transport natural gas to Fore River in years. This is not a collateral attack on rates. Rather, it is rejection of a contract that has led to excess capacity that is "unwanted [and] unused," an outcome that "in no way conflicts" with federal energy law. *Cf. id.*

---

[3]   The Fifth Circuit in *Mirant*, however, did not suggest that its holding was limited to situations of excess capacity. Instead, the Fifth Circuit broadly held that "the FPA does not preempt Mirant's rejection of the [agreement] because it would only have an indirect effect on the filed rate," 378 F.3d at 519-20, and that "[t]he structure of the Bankruptcy

at 38 n.9.

Contrary to Algonquin's arguments, FERC itself has acknowledged that the rejection of a natural gas or electricity contract in under the Bankruptcy Code does not impinge on its regulatory authority under the FPA or NGA.  FERC has long disclaimed jurisdiction over breach of contract disputes, and has conceded that courts are better positioned to hear such disputes.[4]

*See, e.g., Idaho Power Co.*, 39 FERC ¶ 61,032 at 61,092 (1987) ("The Commission does not possess exclusive jurisdiction with respect to breach of contract claims arising under state law."); *Southern Co. Servs., Inc.*, 37 FERC ¶ 61,256 at 61,652 (1986) (same); *Cal. Dept. of Water Res.*, 121 FERC ¶ 61,191 at P 40 (2007) (finding no exclusive jurisdiction and declining to exercise primary jurisdiction where "[t]he parties' contractual dispute is not about the proper rate for service by Sempra to CDWR….  Thus, the parties' contractual dispute does not fall within the Commission's exclusive jurisdiction."), *reh'g denied*, 124 FERC ¶ 61,216 (2008); *Water & Power Dept. of the City of Glendale v. Portland General Elec. Co.*, 113 FERC ¶ 61,285 at P 16 (2005) ("[B]ecause Glendale's complaint 'only seeks enforcement of an existing contract, and not the setting of a new just and reasonable rate,' the case 'does not fall within the Commission's exclusive jurisdiction.'" (citation omitted)), *reh'g denied*, 115 FERC ¶ 61,231 (2006); *Kentucky Utils. Co.*, 110 FERC ¶ 61,285 at P 10 (2004) (finding no exclusive jurisdiction where "Owensboro seeks an interpretation and enforcement of the contract's existing provisions, not a

---

Code … indicates that Congress did not intend to limit the ability of utility companies to reject an executory power contract."  *Id.* at 521.

[4]   FERC has also explained that in circumstances where it does not possess exclusive jurisdiction, it will determine whether to exercise primary jurisdiction over a contract dispute based on three factors:  "(1) whether the Commission possesses some special expertise which makes the case peculiarly appropriate for Commission decision; (2) whether there is a need for uniformity of interpretation of the type of question raised by the dispute; and (3) whether the case is important in relation to the regulatory

change in the contract.").[5]  This is true even in situations where the parties have sought to terminate or void their contracts. [6]

Algonquin's attempts to turn this routine contract dispute into a federal question by arguing that FERC has exclusive jurisdiction over disputes such as these is flatly contradicted by FERC's own rulings on its jurisdiction.  Indeed, FERC has specifically acknowledged that it should not intrude on the contract rejection process, conceding that "the Commission is precluded from taking action under the FPA that impacts a debtor's ability to reject an executory contract."  *Cal. Elec. Oversight Board v. Calpine Energy Servs., L.P.*, 114 FERC ¶ 61,003 at P 11 (2006).  *See also Kern River Gas Transmission Co.*, 101 FERC ¶ 61,374 at P 13 (2002)

---

responsibilities of the Commission."  *Ark. La. Gas Co. v. Hall*, 7 FERC ¶ 61,175 at 61,322 (1979).  None of these factors applies here.

[5] Courts in other jurisdictions have reached similar results.  In *In re Columbia Gas Sys.*, Case No. 91-803, 1991 U.S. Dist. LEXIS 17561 (D. Del. 1991), for example, the District of Delaware affirmed the denial of a motion to withdraw a reference given the difference between concerns associated with contracts between private parties and those related to maintaining continued gas or electric service. *Id.*  at *13-14 (bankruptcy court could approve rejection of a private contract without encroaching on FERC's jurisdiction).

[6] *See Portland General Elec. Co.*, 72 FERC ¶ 61,009 at 61,020 (1995) (finding no exclusive jurisdiction and declining to exercise primary jurisdiction in a case involving, among other things, whether a contract could be terminated, even though "PGE cites a long line of cases that affirm that the Commission has exclusive jurisdiction to determine the reasonableness of rates for the sale of electricity at wholesale in interstate commerce by public utilities such as PGE…. PGE also cites decisions that have held that companies must comply with the Commission's applicable notice requirements before they can terminate rate schedules"); *Williston Basin Interstate Pipeline Co. v. KN Energy, Inc.*, 58 FERC ¶ 61,001 at 61,002-03 (1992) (declining to exercise primary jurisdiction over contract dispute alleging that contracts were voidable as a result of fraud, misrepresentation and duress), *reh'g denied*, 59 FERC P 61,011 (1992), *remanded sub nom.*, *KN Energy, Inc. v. FERC*, 1993 WL 205869 (D.C. Cir. 1993), *vacated in part on other grounds*, 63 FERC ¶ 61,260 (1993); *Southern Co. Servs., Inc.*, 37 FERC ¶ 61,256, at 61,649, 61,652 (1986) (only exercising primary jurisdiction to interpret certain contract provisions in dispute involving claims that alleged that the public utility should be "discharged from its obligations" and seeking "damages and reformation of the [contract] so as to eliminate its obligations thereunder").

("because Contract No. 1866 was an executory contract, [the debtor has] the right to determine, at its sole discretion, whether to reject or accept Contract No. 1866."); *Columbia Gas Transmission Corp.*, 71 FERC ¶ 61,194 at 61,677 (1995) (explaining that FERC had repeatedly found that "Columbia's decision to reject its contracts is an issue to be resolved before the Bankruptcy Court and not subject to the determination of the Commission." (citations omitted)).

Given FERC's own statements on the scope of its jurisdiction (and its acknowledgement of the bankruptcy courts' primacy regarding rejection of executory contracts), there is simply no basis for Algonquin's argument that rejection implicates FERC's authority under the NGA or any other federal energy law.

## CONCLUSION

For the foregoing reasons, the Debtors respectfully request that Algonquin's motion to withdraw the reference be denied, and that this case be remanded to the Bankruptcy Court for further determination of issues that are indisputably within its jurisdiction.

Dated:  September 17, 2010          Respectfully Submitted,

/s/ *Adrienne K. Eason Wheatley*
D. J. Baker
Robert J. Rosenberg
James E. Brandt
Adrienne K. Eason Wheatley
Caroline A. Reckler (appearing *pro hac vice*)
Kimberly A. Posin (appearing *pro hac vice*)
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022-4834
Telephone:  (212) 906-1200
Facsimile:  (212) 751-4864

*Proposed Counsel to the Debtors and Debtors-in-Possession*

17