UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Case No. 10 Civ. 6528 (DLC) |
| Boston Generating, LLC, et al.,[1] | Bankruptcy Case No. 10-14419 (SCC) |
| Debtors. | Chapter 11 |

## DECLARATION OF JEFF HUNTER IN SUPPORT OF OPPOSITION TO MOTION TO WITHDRAW THE REFERENCE

Under 28 U.S.C. § 1746, I, Jeff Hunter, declare as follows under penalty of perjury:

1.  I am a Manager, Executive Vice President and Chief Financial Officer of EBG Holdings LLC ("EBG"), a Delaware limited liability company, whose subsidiary companies are responsible for providing a reliable source of electrical power to the City of Boston and its surrounding communities.

2.  I am submitting this declaration in support of EBG and its affiliated debtors and debtors in possession (collectively, the "Debtors") in their opposition to *Motion of Algonquin Gas Transmission, LLC For Withdrawal of Reference With Respect To First Omnibus Motion of Debtors For Entry of Order Authorizing the Debtors to Reject Certain Executory Contracts Nunc Pro Tunc to Their Respective Notice Dates.* If called upon to testify, I could and would testify competently to the facts set forth herein.

**Experience in the Energy Sector**

3.  I have worked in the energy sector for nearly twenty years. My career in this industry began in 1991, when I worked for Texas Eastern Transmission Company ("Texas Eastern"), whose successor entity, Spectra Energy Corporation, owns Algonquin Gas

---

[1] The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Boston Generating, LLC (0631); EBG Holdings LLC (3635); Fore River Development, LLC (7933); Mystic I, LLC (0640); Mystic Development, LLC (7940); BG New England Power Services, Inc. (0476); and BG Boston Services, LLC (6921).

NY\1684524.7

Transmission, LLC ("Algonquin"), the owner and operator of the Algonquin Hubline pipeline (the "Pipeline").

4. While employed at Texas Eastern, I worked to implement Federal Energy Regulatory Commission ("FERC") Order 636, which required open, non-discriminatory access to the Texas Eastern pipeline, which was Algonquin's primary source of gas supply, by competing, non-affiliated shippers.

5. I left Texas Eastern to become an energy trader at Eastex Energy, where I traded capacity rights on natural gas transmission pipelines serving the Northeast. During the course of my employment, Eastex was acquired by El Paso Natural Gas, which was among the largest pipeline companies in the United States, and whose assets included ownership of the Tennessee Natural Gas pipeline – Algonquin's main competitor.

6. In 1998, I left Eastex to become a Partner with PA Consulting Group, where I served as the Global Practice Head of Energy Strategy & Risk Management for energy commodities. My responsibilities included repossessing and rehabilitating several natural gas fired power plants, including review of governing contracts and working to improve day-to-day management and operations of those firms.

7. In 2003, I co-founded a company whose primary business purpose was acquiring and rehabilitating distressed power-generating assets. When the company was first formed, the founders, together with a few employees, ran every aspect of the business. As we grew in size, we were able to assume more specialized roles. My areas of focus included hedging contracts (which are frequently used in the energy sector to manage risks and market price fluctuations inherent in the conversion of fossil fuels to electric energy), financing, and fuel contracts.

8. In 2007, US Power Generating Company ("US PowerGen") was formed to effect the merger of EBG Holdings, LLC and Astoria Generating Company Holdings, LLC.

At the time of the merger, I was head of Mergers and Acquisitions at US PowerGen. Thus, during the merger process, I became well-versed in the business of EBG and its affiliate entities. I have since become even more familiar with those operations given my role as Executive Vice President and Chief Operating Officer of each subsidiary within the EBG group of companies.

**The Debtors' Corporate Structure**

9. US PowerGen is the parent company of EBG.

10. EBG is the parent company of Boston Generating, LLC ("BostonGen"), which, in turn, is the parent company of three operating companies that own and operate electric power generating facilities located in the Boston metropolitan area; namely, Fore River Development, LLC ("Fore River"), Mystic I, LLC ("Mystic I") and Mystic Development, LLC ("Mystic Development," and together with BostonGen, Fore River, and Mystic I, the "BostonGen Companies"). The BostonGen Companies' generating facilities help to maintain a reliable electricity supply for the city of Boston and surrounding communities.

11. EBG and its affiliate companies, including the BostonGen Companies, are the debtors and debtors in possession in chapter 11 proceedings pending in the United States Bankruptcy Court for the Southern District of New York.

**The BostonGen Companies' Business Operations**

12. The BostonGen Companies' generating facilities are merchant power plants that generate revenue primarily by selling electrical energy and associated products, such as electrical capacity, into regional wholesale markets administered by ISO New England Inc. ("ISO-NE") and regulated by FERC. Unlike regulated, rate-based power plants (which sell electricity in the retail market to captive retail customers at cost-based rates and are financed by the direct utility customers within that market), merchant power plants are financed by

banks and sell the electricity they generate into the wholesale power market at market-based rates.  Retail suppliers purchase power in the wholesale market and sell it directly at retail prices to end users.

13.     The merchant generation capacity of the BostonGen Companies constitutes one of the largest merchant generation fleets in New England.

14.     As mentioned above, the BostonGen Companies own and operate three power generating facilities: (1) Mystic Station, (2) Mystic 8&9, and (3) Fore River, which help to ensure the provision of reliable electric supply to the greater Boston area.

15.     Mystic Station.  Mystic I owns Mystic Station, which consists of a power generation facility installed in 1969 and a power generation facility installed in 1975, both of which are located in Everett, Massachusetts, which is directly north of Boston.  Mystic Station generates electricity using fuel supplied primarily by Distrigas of Massachusetts LLC ("Distrigas").

16.     Mystic 8&9.  Mystic Development owns Mystic 8&9, which became operative in April and June 2003.  They are located adjacent to Mystic Station on a 53-acre site in Everett, Massachusetts.  Mystic 8&9 generate electricity using fuel supplied by the LNG Terminal of Distrigas, which is adjacent to the Mystic 8&9 plants.

17.     Fore River.  Fore River owns a power generation facility located on a 77-acre site in North Weymouth, Massachusetts, which is approximately 12 miles south of Boston (the "Fore River Facility").  The Fore River Facility commenced operations in August 2003.  The Fore River Facility generates electricity using fuel transported over the Pipeline.  Several suppliers transport fuel on the Pipeline.  The Fore River Facility procures all of its fuel supply requirements through a contract.  Sempra Energy Trading LLC ("Sempra") previously provided these services.  Currently, Sequent Energy Management, L.P. ("Sequent") provides fuel management services to Fore River.

**Terms of the Algonquin Service Agreement**

18.     When US PowerGen merged with the BostonGen Companies, including the Fore River Facility, the Service Agreement (Applicable to Rate Schedule AFT-1) ("<u>Service Agreement</u>") between Fore River and Algonquin was already in place.

19.     The Algonquin Service Agreement is a transportation agreement pursuant to which Fore River pays a fixed fee of $718,000 per month to Algonquin in exchange for the right to use capacity on the Pipeline to transport up to 140,000 dekatherms ("<u>Dth</u>") of natural gas per day on a firm basis to the Fore River Facility.  Fore River pays Algonquin the monthly fixed fee simply to reserve this capacity regardless of whether any of the capacity is actually utilized.

20.     Fore River pays an additional variable fee based upon how much of the reserved capacity is actually utilized at any given time.  The negotiated rates provided for in the Service Agreement were approved by FERC in February 2008.

21.     Algonquin only provides Fore River with a right to priority use of transportation capacity on its Pipeline from a specified receipt point to a specified delivery point (at "Fore River"); it does not supply Fore River with any natural gas under the Service Agreement.

22.     Pursuant to the Service Agreement, gas can be transported to the Fore River Facility from two "Primary Receipt Points".  One contract's primary receipt point is where the Pipeline connects to what are known as the Q and I-3 systems ("<u>Q/I-3</u>").  The other contract's primary receipt point is in Beverly, Massachusetts ("<u>Beverly</u>"), where the Pipeline connects to the Maritime & Northeast pipeline (which deliver gas from the Maritime provinces in Canada, including New Brunswick, Nova Scotia, and Newfoundland).  The total amount of reserved transportation capacity available to Fore River under the Service

Agreement is split equally between the Q/I-3 and Beverly receipt points (i.e., up to 70,000 Dth from each).

23. Given FERC's open access rules for natural gas pipelines (which, as mentioned above, I worked to implement for Algonquin's affiliated pipeline in 1991), transportation capacity on the Pipeline is available to competing, non-affiliated companies, referred to as "shippers," on a non-discriminatory basis. Under FERC's open access rules, these shippers, in turn, are free to resell this capacity to other shippers.

24. In other words, as a result of the open access rules, there are numerous, competing shippers from whom Fore River can purchase fuel on the Pipeline to ensure the available supply of natural gas to the Fore River Facility. Fore River's suppliers can use the transportation capacity available from the Algonquin Service Agreement, or they can use transportation capacity available from other shippers. For example, Sequent, from which Fore River purchases all of its gas required to generate electricity at the Fore River Facility, includes in its price costs for transportation over the Pipeline in addition to gas supply costs.

**The Algonquin Service Agreement Has No Meaningful Value to Fore River**

25. Even at the time of the merger between US PowerGen and the BostonGen Companies, US PowerGen knew that the Algonquin Service Agreement had little if any value.

26. That is because only a small, unreliable amount of gas is available at both of the receipt points identified in the Algonquin Service Agreement.

27. As far as I am aware, Fore River has never been able to obtain gas at the Q/I-3 receipt point. As a result, a *full* half of the transportation capacity reserved under the Service Agreement (i.e., 70,000 Dth) is not useable.

28. In addition, the Beverly receipt point is typically unreliable and inconsistent as a source of gas supply for the Fore River Facility because it draws fuel from Canada, whose

6

primary natural gas reserves have depleted much faster than originally anticipated. As a result, gas available for purchase at that receipt point has not been frequently available in sufficient quantity. Additionally, Beverly, as a gas supply source, is typically uneconomic resulting in severe underutilization of the only potentially operative receipt point identified in the Algonquin Service Agreement.

29. Far more reliable sources of gas are available through natural gas marketers who sell gas to Fore River delivered at the plant, most of which draw their supplies from the Gulf Coast region and then transport that gas to the Northeast market on pipelines like Texas Eastern which feed into the Algonquin Pipeline.

30. Although the Algonquin Service Agreement provides no meaningful value to Fore River, my understanding is that the contract was entered into as a condition precedent to financing when the Fore River Facility was constructed.

31. Secondary opportunities for obtaining capacity on the Pipeline have always been available to merchant power plants (e.g., by purchasing transportation capacity from existing transportation capacity holders, who can bundle transportation costs into their overall delivered fuel price). However, there was a time when it was not uncommon for debt financing of merchant power plants done on a non-recourse basis to be conditioned on the execution of a long-term, firm transportation contract like the Algonquin Service Agreement. My understanding is that such financing requirements were motivated by a desire to ensure that the plants would have adequate fuel supply to generate power, consequently allowing the merchant power generator to service its debt from its power sale revenues.

32. My understanding is that such long-term, firm transportation agreements are no longer required as a condition precedent to financing given changes in the project finance market.

33. The Algonquin Service Agreement does not add unique value or provide increased reliability to the Fore River Facility given that Fore River's delivered fuel requirements can easily be met through reliance on other shippers and suppliers, and further given the fact that the receipt points in the Algonquin Service Agreement do not provide any source of gas supply (in the case of the Q/I-3 receipt point) or an unreliable and inconsistent source of gas supply in the case of the Beverly receipt point where there has never been adequate economic supply available to even partially supply the Fore River Facility.

34. As a result of these limitations, Fore River has treated the Algonquin Service Agreement like a fixed cost that simply must be incurred.

**Concerns with the Algonquin Service Agreement**

35. Fore River never needs to rely on the transportation capacity available to it under the Service Agreement, and prefers not to use it in any event.

36. First, gas is not readily available at either receipt point.

37. Second, Fore River has historically been able to procure gas and have it delivered to the Fore River Facility at a delivered cost lower than possible utilizing the Algonquin Service Agreement, without regard to the Algonquin Service Agreement. Indeed, Fore River has never had a problem procuring necessary fuel for the Fore River Facility. Given FERC's rules guaranteeing non-discriminatory access to Algonquin's Pipeline, there is more than sufficient gas available for delivery to the Fore River Facility, both during peak electrical demand season and otherwise, without regard to the Algonquin Service Agreement.

38. For example, over 76% of the gas Fore River purchased between January 1, 2008 and August 31, 2010, did not involve the utilization of the transportation capacity available under the Algonquin Service Agreement. And Fore River can readily procure 100% of its daily gas requirements without using the capacity reserved under the Service Agreement. As just one example, the daily volume of fixed price gas for next day delivery at

the Algonquin Pipeline and reported by The IntercontinentalExchange averaged 185,000 Dth per day for the period of September 1, 2009 through August 31, 2010 – over three times the approximately 55,000 Dth per day that are delivered to the Fore River Facility.

39. Third, there are certain technical aspects of the Service Agreement that are not needed by Fore River. For example, the pressure assurance provisions in the Service Agreement, which protect against drops in gas pressure, have been mooted by Fore River's installation of natural gas compressors. These compressors allow the Fore River Facility to operate when the pressure on the Pipeline drops below the required pressure and prevent the BostonGen Companies from having to rely on pressure assurances provided for in the Service Agreement.

40. For all these reasons, Fore River neither wants nor needs the transportation capacity paid for through the Algonquin Service Agreement because it is a significant drain on our resources with no meaningful offsetting benefit.

41. Failing to use the Service Agreement has had no impact at all on the ability of the Fore River Facility to operate reliably. Prior occasions where Fore River has utilized transportation capacity under the Algonquin Service Agreement has never been the result of reliability concerns. Indeed, to my knowledge, Fore River has never been forced to use the Service Agreement because firm transportation capacity was not otherwise available or because Fore River needed natural gas to be delivered on the "priority" basis set out in the agreement.

**Given its Redundancy, the BostonGen Companies Have Sought to Reject the Algonquin Service Agreement**

42. Despite their strategically positioned and highly efficient facilities and other competitive advantages, the BostonGen Companies are over-levered and, due to market

conditions, are unable to generate sufficient cash to service their debt and fund ongoing operations.

43. The BostonGen Companies' liquidity constraints will be exacerbated as a result of the expiration of their energy hedge agreements on December 31, 2010. Those hedges are currently cash-positive and help the BostonGen Companies service their debt and fund operations. Expiration of those hedges at the end of this year will leave the BostonGen Companies with no way to solve a looming liquidity crisis projected for the first quarter of 2011.

44. Given the BostonGen Companies' current liquidity position and projected liquidity needs, each of the BostonGen Companies filed for bankruptcy protection under chapter 11 in the United States Bankruptcy Court for the Southern District of New York.

45. As part of the bankruptcy process, the BostonGen Companies have reviewed each of their existing contracts and, in the exercise of their business judgment, determined which contracts should continue as necessary components of the Debtors' business, and which contracts should be rejected on the ground that they provide no continuing benefit to the BostonGen Companies or their estates.

46. As a result of that exercise, the BostonGen Companies determined that it would be most advantageous to reject the Algonquin Service Agreement. The motion to reject the Algonquin Service Agreement explains that Fore River neither needs nor wants the transportation capacity it pays to reserve under the Service Agreement, especially given the significant burden the cost of this reserved capacity poses on the Fore River estate.

NY\1684524.7

I swear under penalty of perjury that the foregoing is true and correct.

Dated: September 17, 2010

_____
Jeff Hunter